UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20374-CR-MARTINEZ/SANCHEZ

UNITED STATES OF AMERICA

vs.

GAL HAIMOVICH,

Defendant.
_____/

## FACTUAL BASIS

The United States Attorney's Office for the Southern District of Florida, and Gal Haimovich ("the defendant"), through his undersigned counsel, stipulate and agree that, were this case to proceed to trial, the Government would prove the following:

1. Between at least in or around March 2022, and continuing through in or around May 2023:

### The Export Control Reform Act

    a. The Export Control Reform Act ("ECRA") provided that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled" for various purposes. 50 U.S.C. § 4811. ECRA granted the President the authority to control: "(1) the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons; and (2) the activities of United States persons, wherever

  located, relating to" specific categories of items and information. 50 U.S.C. § 4812.

b. The Secretary of Commerce was granted the authority to establish ECRA's applicable regulatory framework. 50 U.S.C. § 4812. Pursuant to that authority, the Department of Commerce ("DOC") reviewed and controlled the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"). In particular, the EAR restricted the export of items that could contribute to the military potential of other nations or that could be detrimental to United States foreign policy or national security.

c. The EAR imposed licensing and other requirements for certain items to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another. The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL"), 15 C.F.R. § 774, Supp. No. 1, and were categorized by Export Classification Control Numbers ("ECCN"), each of which had export control requirements depending on the destination, end use, and end user.

d. It was unlawful for any person to violate, attempt to violate, conspire to violate, or cause a violation of ECRA's provisions or any regulation, order,

   license, or other authorization issued under ECRA. 50 U.S.C. § 4819.

e. On February 24, 2022, in response to Russia's most recent invasion of Ukraine, the United States Department of Commerce imposed new license requirements on exports and re-exports to Russia. As of April 8, 2022, all items on the CCL required a license to go to Russia. See Volume 87, Federal Register, Page 22,130 (published Apr. 14, 2022). Those rules were eventually codified in Title 15, Code of Federal Regulations, Part 746.8, which stated, "a license is required, excluding deemed exports and deemed reexports, to export, reexport, or transfer (in-country) to or within Russia or Belarus any item subject to the EAR and specified in any Export Control Classification Number (ECCN) on the CCL." Requests for licenses to export items on the CCL to Russia were reviewed under a policy of denial. See 15 C.F.R. § 746.8(b).

### The Defendant and Related Entities

f. The defendant, a citizen of Israel, is the owner of Control Towers Tel Aviv, CTi TLV, an international freight forwarding company headquartered in Israel. CTi TLV was an affiliate in a group of companies—collectively known as Control Towers or Control Towers International ("CTI")—which conducted business in France, Israel, the United Kingdom, Germany, and the United States. Control Towers International's U.S. operations were based in Doral, in the Southern District of Florida. Through the affiliate

3

      relationship, defendant had authority to direct certain actions and/or operations of the group's U.S. business, which he exercised by, for example, causing shipments to be unlawfully exported from the group's business in the Southern District of Florida.

  g. The defendant, through the CTI entities and several other related entities, including "WGL," operated as a freight forwarder of choice for individuals and entities seeking to unlawfully export goods, including aircraft parts, to Russia in violation of U.S. export laws and regulations, namely, ECRA and the EAR. Included among these entities were companies affiliated with Siberian Airlines d/b/a S7 Airlines, a Russian company whose export privileges were denied by the U.S. Department of Commerce in June 2022.[1]

  h. The defendant facilitated the exportation of aircraft parts from U.S. manufacturers and suppliers, through South Florida, to various third-party transhippers on behalf of agents and employees of Russian businesses, who routinely and repeatedly instructed the defendant, in written communications, to deceive the manufacturers and suppliers about the aircraft parts' ultimate destination—Russia. At times, and in order to

---

[1] On or about June 24, 2022, the Department of Commerce, Bureau of Industry and Security issued an "Order Temporarily Denying [the] Export Privileges"—known as a temporary denial order, or "TDO"—directed at Siberian Airlines d/b/a S7 Airlines. Among other things, that order provided that "no person may, directly or indirectly, . . . [e]xport, reexport, or transfer (in-country) to or on behalf of Siberian [Airlines] any item subject to the EAR except directly related to safety of flight and authorized by the Department of Commerce pursuant to Section 764.3(a)(2) of the Regulations." The original TDO was for a period of six months, but it was reissued on or about December 11, 2023, for a period of one year, and remains in effect as of the date of this agreement.

conceal his involvement in the conspiracy, the defendant transacted business under a false name: "Yaron Zehavi."

### The Offense

i. In sum, the defendant conspired with others, including agents and employees of Siberian Airlines d/b/a S7 Airlines, to unlawfully smuggle from the United States export-controlled aircraft parts, including avionics, for the benefit of Russian customers and to conceal the scheme by submitting false information in export filings required by U.S. authorities.

j. For example, between July and November of 2022, the defendant and the CTI-affiliated entities arranged for 66 shipments to Maldivian Company-1—a company in the Maldives that unlawfully transshipped U.S.-origin goods to Russia, as evidenced by admissions and documentation of Russia-bound shipments obtained from an employee of Maldivian Company-1.

k. Additionally, between April of 2022 and April of 2023, the defendant and his companies arranged for 111 shipments to two freight forwarding companies in the United Arab Emirates, which shipped aircraft parts to Russia according to employee admissions and documentation.

l. Further, according to Internet Protocol ("IP") address records, shipments of aircraft parts sent by the defendant and his companies via Federal Express were routinely tracked by Internet users in Russia and Belarus, and on occasion, by agents and employees of Siberian Airlines d/b/a S7 Airlines.

5

m. For example, in July of 2022, the defendant received an e-mail from an employee of Siberian Airlines d/b/a S7 Airlines, directing the defendant to "arrange transportation to Moscow" of an aircraft part called an "air data module"—a sensor that assists an airplane pilot's navigation. This air data module was controlled on the Commerce Control List under ECCN 7A994 for "anti-terrorism" reasons and required a license for export to Russia. In the conclusion of the e-mail, the writer stated, in red, highlighted text: "the actual shipper should not know that the cargo is following to Russia!"

n. Before the air data module was delivered to the defendant's company in South Florida, on or about August 2, 2022, the defendant directed a co-conspirator to falsely inform the part's U.S. vendor that it would be shipped to the Maldives, specifically, to Maldivian Company-1. In truth, and as documented in subsequent e-mail communications between the defendant and Siberian Airlines employees, the defendant shipped the air data module to Moscow, as directed.

o. As another example, the following month, the defendant attempted to export an air data and inertial reference unit, sometimes referred to as an "ADIRU," from Miami, Florida, to Russia at the direction of Siberian Airlines employees and agents. The Siberian Airlines representatives directed the defendant and his company as follows: "Dear [Control Towers International] team, please arrange transportation to Moscow orders. . . . The main point is that S7 [Siberian Airlines] should not be involved in this

      deal, until the goods reach the transit point. Moreover, the vendor must not understand that the goods are going to Russia."

p. Once the part was shipped to the defendant's company in South Florida, the defendant warned his co-conspirators that the air data and inertial reference unit part "is a very sensetive [sic] components and can raise lots of red flags" and further directed his co-conspirators to falsely inform the part's U.S. vendor that it was bound for a destination other than Russia. The defendant offered two options: shipping the part to Jordan "and from there tranship to MOW [Moscow]" or shipping "it to UAE and then tranship to MOW."

q. In fact, and as the defendant then knew, the aircraft part (i.e., the ADIRU) that he was attempting to export to Siberia Airlines, a barred entity in Russia, was controlled on the Commerce Control List under ECCN 7A103.a for "missile technology" reasons and required a license for export to Russia.

r. In addition, between September and October of 2022, the defendant filed and caused to be filed false and fraudulent electronic export information—required documentation submitted to the U.S. Government in connection with certain export shipments from the United States—in order to conceal the ultimate recipient of aircraft fuel pumps exported by the defendant from the United States to Russia for the benefit of Siberian Airlines d/b/a S7 Airlines.

s. During the conspiracy period, the defendant sent invoices to various customers seeking payment of at least $2,024,435.44 in exchange for the defendant's facilitation of the unlawful export of aircraft parts to Russia. In addition, the defendant, personally, through, and during the course of the conspiracy charged in the Information, exported or intended to export the items listed in paragraph 14 of the plea agreement.

2. The parties agree that the above is a sufficient factual basis for the Defendant's knowing and voluntary guilty plea to the charge in the information.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 9/9/24     By: _____
CHRISTOPHER BROWNE
ASSISTANT U.S. ATTORNEY

CHRISTOPHER M. RIGALI
TRIAL ATTORNEY
NATIONAL SECURITY DIVISION
U.S. DEPARTMENT OF JUSTICE

ATTORNEYS FOR THE UNITED STATES

Date: 9/9/24     By: _____
DAVID SELTZER
ATTORNEY FOR DEFENDANT

Date: 9/9/24     By: _____
GAL HAIMOVICH
DEFENDANT